IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: : | CHAPTER 11 |
| : | |
| EXIDE TECHNOLOGIES, : | Case No. 13-11482 (KJC) |
| : | |
| Reorganized Debtor. : | |
| : | |
| WEST SALEM STORAGE, LLC, : | Adv. No. 17-51826 (KJC) |
| : | (Re: D.I. 4) |
| Plaintiff, : | |
| v. : | |
| : | |
| EXIDE TECHNOLOGIES, : | |
| Defendant. : | |

## **OPINION**[1]

West Salem Storage, LLC (the "Plaintiff" or "West Salem") filed a complaint against the reorganized debtor, Exide Technologies ("Exide"), seeking a declaratory judgment that the confirmed plans in Exide's two prior bankruptcy cases did not discharge West Salem's claims against Exide based on the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") or its Oregon state law equivalent. Currently before the Court is Exide's Motion to Dismiss Complaint under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012.[2] For the reasons set forth below, the Motion to Dismiss will be granted.

---

[1] This Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (I).
[2] Adv. D.I. 4 (the "Motion to Dismiss").

## **FACTUAL ALLEGATIONS**

The Complaint alleges the following facts.

This adversary proceeding involves environmental contamination at 576 Patterson St. NW, Salem, Oregon (the "Property"). Exide or its corporate predecessors previously owned and operated a battery manufacturing plant on the Property. West Salem purchased the Property in 2011. (Compl. ¶1). West Salem incurred expenses of nearly $1 million due to the presence of lead on the Property. (Compl. ¶2). West Salem did not learn about the presence of lead in concentrations above regulatory standards inside the building on the Property until the spring of 2017. (*Id.*).

<u>Ownership History of the Property</u>

From 1945 to 1983, Gould Inc. and its corporate predecessors owned the Property. (Compl. ¶7). In 1983, Gould Inc. conveyed the Property to GNB Batteries, Inc. (Compl. ¶9). Through a series of name changes, GNB Batteries, Inc. eventually became GNB Technologies, Inc. In 2001, GNB Technologies, Inc. merged into Exide Corporation. (Compl. ¶10). Prior to the merger, the New York Times reported that Exide Corporation was the world's largest manufacturer of automotive batteries, and GNB Technologies manufactured automotive and industrial batteries. (Compl. ¶12).

On June 28, 2002, Exide Technologies, f/k/a Exide Corporation, conveyed the Property to Faries Salem Properties, LLC. (Compl. ¶13). The Special Warranty Deed states that Exide is the "successor by merger to GNB Batteries, Inc." (*Id.*).

On June 15, 2007, Faries Salem Properties, LLC conveyed the Property to Patterson Business Park, LLC. (Compl. ¶14). On March 2, 2011, Patterson Business Park, LLC conveyed the Property to EverGreen Environmental Development Corporation. (Compl. ¶15). On

November 30, 2011, EverGreen Environmental Development Corporation sold the Property to the Plaintiff, West Salem. (Compl. ¶16).

Remediation of Lead in the Soils on the Property

In the early 1990s, the Oregon Department of Environmental Quality ("DEQ") became aware of lead contamination in soils at the Property. (Compl. ¶29). According to the DEQ, "spills of lead occurred during GNB Battery's operations." (*Id.*).

In November 1999, DEQ determined that no further action was required to remediate lead contaminated soil at the site, on the condition that, among other things, the deed to the Property would contain an easement and equitable servitude ("EES") limiting the site usage to industrial operations only. (Compl. ¶30).

Exide's Chapter 11 Cases

In April 2002, Exide filed for chapter 11 bankruptcy protection in this Court (Case No. 02-11125) (Compl. ¶17). On May 10, 2002, Exide obtained an Order from this Court authorizing the sale of de minimis assets. (Compl. ¶18). The Order states "nothing in this Order or any asset purchase agreement releases or nullifies any liability to a governmental entity under police and regulatory statues or regulations that any entity would be subject to as the owner or operator of the property after the date of entry of this Order." (*Id.*). On June 4, 2002, a Notice of Sale of De Minimis Assets was issued stating that the Property was being sold as a De Minimis Asset pursuant to the Court's May 10, 2002 Order. (Compl. ¶19). Shortly thereafter, on June 28, 2002, Exide sold the Property to Faries Salem Properties, LLC. (*Id.*). In April 2004, the Court confirmed Exide's plan of reorganization. (Compl. ¶20).

In June 2013, Exide filed a second chapter 11 bankruptcy case (Case No. 13-11482) (Compl. ¶21). As part of the June 2013 bankruptcy case, Exide filed the "Global Notes, Methodology, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities

and Statement of Financial Affairs," which listed the name and address of every site for which the debtor received notice in writing by a governmental unit that it may be liable or potentially liable under, or in violation of, an environmental law. (Compl. ¶22). Exide identified the Property on page 362 of 398 pages in that document. (*Id.*).

Exide listed Faries Salem Properties, LLC (the party to whom Exide had sold the Property) as an unsecured creditor in Exide's 2013 bankruptcy case. (Compl. ¶24), but by June 2013, Plaintiff West Salem had owned the Property for more than a year and a half. (Compl. ¶23). However, Exide did not list Plaintiff West Salem as an unsecured creditor in Exide's 2013 bankruptcy case. (Compl. ¶25). Exide did not provide actual notice of its 2013 bankruptcy to Plaintiff West Salem. (Compl. ¶26). During the course of Exide's second bankruptcy case (2013-2015), Plaintiff West Salem did not know that lead was present in the building on the Property at levels that would require it to vacate its tenants and conduct substantial investigation, remediation and restoration work at the Property. (Compl. ¶28).

In March 2015, this Court confirmed Exide's plan of reorganization. (Compl. ¶27). Articles 12.2, 12.7 and 12.11 of the confirmed plan contained discharge, claim holder release and injunction provisions.[3]

<u>Plaintiff's Purchase and Use of the Property; Discovery of Lead in the Building</u>

Prior to Plaintiff West Salem's purchase of the Property, the building on the Property was leased to tenants that were using it for non-industrial commercial and recreational uses. (Compl. ¶31). On November 18, 2011, prior to Plaintiff West Salem's purchase of the Property, DEQ informed Plaintiff that commercial and recreational uses of the Property were acceptable as long as there was no contact with the contaminated soil. (Compl. ¶32). Plaintiff West Salem

---

[3] Main Case D.I. 3409.

purchased the Property and leased it to various tenants who used it for commercial and recreational purposes. (Compl. ¶33).

On February 2, 2017, DEQ informed Plaintiff that removing the 1999 deed restriction limiting the site usage to industrial operations required further investigation and remediation of shallow soils and "the historic building will also be required to be tested for the presence of lead dusts and residues." (Compl. ¶34). In late February 2017, DEQ learned that dust samples from inside the former battery building contained high levels of lead. (Compl. ¶35). On March 23, 2017, DEQ, the Oregon Health Authority, and Oregon OSHA required that the building be closed until cleaning and further assessment could be completed. (Compl. ¶36). Immediately thereafter, Plaintiff West Salem vacated five commercial tenants from the building and delayed the plans for a sixth tenant to open its business at the Property. (Compl. ¶37). In April 2017, in response to DEQ's requirement to investigate and remediate the Property, Plaintiff West Salem entered into an agreement with DEQ in which it agreed to pay for DEQ review and oversight of the investigation and cleanup of hazardous substances at the Property. (Compl. ¶38). Plaintiff West Salem has incurred approximately $1.2 million of expenses related to the investigation and remediation of lead at the Property and approximately $202,000 compensating tenants for damages sustained for not having access to the Property. (Compl. ¶39).

## **DISCUSSION**

Exide seeks dismissal of the Complaint, arguing that West Salem's environmental liability claims arose before Exide filed its 2013 bankruptcy petition, and, therefore, are subject to the

discharge, release and injunction provisions in the 2015 confirmed plan.[4] Exide contends that discharging the claims does not violate the Due Process Clause of the Constitution because West Salem was an unknown creditor who received constructive notice of the bar date for filing claims via publication.

West Salem counters that its claims were not discharged because the claims arose *after* confirmation of Exide's plan in 2015. West Salem argues that the Third Circuit's test for determining when a claim arises - - the *Grossman's* "exposure test" - - does not apply to environmental liability claims. Instead, West Salem asserts that the Court should employ a "fair contemplation" test, under which its claims would arise post-confirmation due to the lack of indicia pre-petition to alert West Salem of its potential claims against Exide. Alternatively, West Salem contends that its claim did not arise pre-confirmation under the *Grossman's* test because it was not exposed to Exide's product or conduct until 2017, when it became aware of the lead dust inside the building. Finally, West Salem also argues that dismissal is improper because it did not receive constitutionally sufficient notice of the bankruptcy case or bar date for filing claims.

**(a) Motion to Dismiss Standard**

Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012(b), governs a motion to dismiss for failure to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."[5] When reviewing a motion to dismiss, the court will construe the complaint "in the light most favorable to the plaintiff." [6]

---

[4] Because I find that the claims were discharged by the 2015 plan confirmation, I do not address the issue of whether the claims were discharged even earlier by the plan confirmed in the 2002 bankruptcy case.

[5] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).

[6] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[7] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."[8] The Court of Appeals for the Third Circuit has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." [9]

When deciding a motion to dismiss, a court may not consider matters extraneous to the pleadings, but "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."[10] The movant carries the burden of demonstrating that dismissal is appropriate.[11]

**(b) The Plaintiff's Claims Arose Before Plan Confirmation in 2015**

Addressing unknown future claims in a bankruptcy case involves "two competing concerns: the Bankruptcy Code's goal of providing a debtor with a fresh start by resolving all claims arising from the debtor's conduct prior to its emergence from bankruptcy; and the rights of individuals who may be damaged by that conduct but are unaware of the potential harm at the time of the

---

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[8] *Twombly*, 550 U.S. at 555 (citations omitted).

[9] *Burtch*, 662 F.3d at 221 (citations omitted).

[10] *Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)).

[11] *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d at 408.

debtor's bankruptcy."[12] The parties dispute how to determine when West Salem's environmental claims "arise." They suggest two options: the *Grossman's* "exposure test," or the "fair contemplation" test.

The Third Circuit's *Grossman's* decision, as later expanded in the *Wright v. Owens Corning* decision, instructs that "a claim arises when an individual is exposed pre-confirmation to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the [Bankruptcy] Code."[13] The Third Circuit wrote that the test was "an amalgam of the two tests that other Courts of Appeals generally follow - - the conduct test and the pre-petition relationship test."[14] The "conduct test" arises "when the acts giving rise to [the] liability were performed, not when the harm caused by those acts was manifested."[15] The pre-petition relationship test provides that "a claim arises from a debtor's pre-petition tortious conduct where there is also some pre-petition relationship between the debtor and the claimant, such as a purchase, use, operation of or exposure to the debtor's product."[16] Thus, the *Grossman's* test "requires individuals to recognize that, by being exposed to a debtor's product or conduct, they might hold claims even if no damage is then evident."[17]

---

[12] *Wright v. Owens Corning*, 679 F.3d 101,105 (3d Cir. 2012)

[13] *Wright*, 679 F.3d at 107; *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's, Inc.)*, 607 F.3d 114, 125 (3d. Cir. 2010). *Grossman's* held that a claim arises when an individual is exposed *prepetition* to the Debtor's product or conduct giving rise to an injury which underlies a right to payment. *Grossman's*, 607 F.3d at 125 (emphasis added). *Wright* clarified that a claim arises if an individual is exposed *pre-confirmation* to the product or conduct giving rise to the injury. *Wright*, 679 F.3d at 107 (emphasis added).

[14] *Wright*, 679 F.3d at 106.

[15] *Id.* (citing *Watson v. Parker (In re Parker)*, 313 F.3d 1267 (10th Cir. 2002) and *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir. 1988)).

[16] *Id.* (quoting *Grossman's*, 607 F.3d at 1230); *see also Epstein v. Off'l Comm. of Unsecured Creditors (In re Piper Aircraft Corp.)*, 58 F.3d 1573, 1576 (11th Cir. 1995); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2nd Cir. 1991).

[17] *Wright*, 679 F.3d at 106.

West Salem argues that it was not exposed to the Debtor's product - - batteries - - or the Debtor's conduct - - battery manufacturing - - prepetition. West Salem's claims, however, are for costs incurred in cleaning up contamination on the Property due to the Debtor's products and conduct. When West Salem purchased the Property in 2011, it learned that the Property was subject to an EES that restricted the Property's use due to environmental contamination caused by the Debtor's products and conduct on the Property. Thus, well before plan confirmation in 2015, the EES notified West Salem that the Property had been exposed to Exide's product (lead) or conduct (environmental contamination) that could give rise to an injury, even though at the time West Salem purchased the Property, it was not aware of the extent of any potential injury. Under the *Grossman's* test, West Salem's claims arose prepetition.

However, West Salem argues that *Grossman's* application to environmental claims is unclear. The plaintiffs in *Grossman's* were tort victims pursuing product liability claims,[18] and the *Grossman's* Court noted that it was not deciding whether the exposure test should apply to environmental cleanup claims.[19] Therefore, West Salem argues that this Court should analyze environmental claims using the Ninth Circuit's "fair contemplation" test.

The "fair contemplation" test provides that "all future response and natural resource damages cost[s] based on pre-petition conduct that can be fairly contemplated by the parties at the time of the [d]ebtors' bankruptcy are claims under the [Bankruptcy] Code.'"[20] A party fairly

---

[18] *Grossman's*, 607 F.3d. at 117-18. However, *Grossman's* is not necessarily limited to tort claims. *See In re Rodriguez*, 629 F.3d 136, 139, 142 (3d Cir. 2010) (applying *Grossman's* to determine when a contractual claim arises).

[19] *Grossman's*, 607 F.3d at 125 n.11 ("Because we have before us an asbestos case, we do not decide when a 'claim' arises in the context of an environmental cleanup case involving conflicting statutory frameworks.").

[20] *California Dept. of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 930-31 (9th Cir. 1993) (quoting *In re National Gypsum*, 139 B.R. 397, 409 (N.D Tex. 1992)); *See also In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775, 786 (7th Cir. 1992) ("[W]hen a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with

contemplates potential liability when there are sufficient indicia of future costs based on prepetition conduct - - including knowledge by the parties of a site for which a debtor may be liable as a potentially responsible party (or "PRP") under CERCLA, notification by the EPA of PRP liability, commencement of investigation or cleanup activities, or the incurrence of response costs.[21]

Although West Salem agrees that it was aware of prior remediation efforts to clean up lead contamination in the Property's soil, it claims that, in 2011, the DEQ "clarified that occupational uses were acceptable as long as there was not [sic] contact with the contaminated soil."[22] West Salem contends that, at the time of Exide's Plan confirmation in 2015, it could not have reasonably predicted or "fairly contemplated" that it would incur any costs (let alone over $1 million) investigating and remediating lead in the building at the Property. Hence, its clean-up claims did not arise until February 2017, two years after Plan confirmation, when it became aware of contamination in the building.

However, West Salem's argument is not convincing. Information available to West Salem when it purchased the Property in 2011 included the EES, which states, in relevant part:

> B. The 4-acre site is located in a residential/industrial area in Salem, Oregon. The site consists of one large building that once housed offices, battery storage areas and a battery finishing area. Also onsite are the inactive components of a wastewater treatment unit, a materials storage area, a loading dock, and a receiving dock. There are designated asphalt-paved parking lots along the north and south property boundaries.
>
> C. Investigations have been performed at the site since 1991 to assess impacts to soil and groundwater from historical operating practices. The contaminants of concern were lead and the constituents of petroleum-based heating fuel. The investigations were conducted in accordance with DEQ-approved work plans.

---

regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim . . . .").
[21] *National Gypsum*, 139 B.R. at 408.
[22] Complaint, ¶ 30; Ex. M and N.

10

D. The investigations confirmed that groundwater has not been impacted by the chemicals of concern.

E. The investigation confirmed the presence of elevated concentrations of lead in shallow onsite soils. GNB removed contaminated soil in these areas to the extent feasible in accordance with the Numerical Soil Cleanup Levels . . . .

F. After providing a 30-day period in October 1998 for the public to comment on the investigation and cleanup, the DEQ determined that no further action is required to characterize the nature and extent of contamination and no additional remedial action is required to address soil contamination.

G. By this Equitable Servitude and Easement, DEQ provides potential future owners or lessees with knowledge of site conditions. It states that certain restrictions apply to the excavation and placement of contaminated soils, that the Property may be used for industrial operations only, and required DEQ review and approval of site activities if current zoning or site use changes.

H. The provisions of this Equitable Servitude and Easement are intended to protect human health and the environment.

. . . .

5.1 All conditions and restrictions contained in this Equitable Servitude and Easement shall run with the land, until such time as any condition or restriction is removed by written certification from DEQ that the condition or restriction is no longer required in order to protect human health or the environment.

5.2 Any person who at any time owns, occupies, or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every condition and restriction contained in this Equitable Servitude and Easement, whether or not any reference to this Equitable Servitude and Easement is contained in the instrument by which such person or entity acquired an interest in the Property.

5.3 The Owner of any portion of the Property shall notify DEQ at least ten (10) days before the effective date of any conveyance, grant, gift, or other transfer, in whole or in part, of Owner's interest in the Property.

5.4 The Owner of the Property shall notify DEQ within thirty (30) days following Owner's petitioning for or filing of any document initiating a

rezoning of the Property that would change the base zone of the Property under the Polk County zooming code or any successor code.[23]

The EES provides information about the prior use and contamination on the Property. Further, the EES limited the use of the Property. Removal of the EES or rezoning of the Property could not occur without notice to the DEQ and an examination of whether the "condition or restriction is no longer required in order to protect human health or the environment."[24] Therefore, West Salem received information well prior to the 2013 bankruptcy filing that would allow West Salem to fairly contemplate incurring future response and natural resource damages costs on the Property.

Accordingly, whether I apply either the *Grossman's* test or the fair contemplation test to the facts alleged in the Complaint, the result is still the same. West Salem's claims arose prior to Exide's 2013 bankruptcy filing and, therefore, are subject to the discharge injunctions in Exide's Plan.

**(c) West Salem had Constitutional Notice of the Bar Date and Confirmation Hearing.**

West Salem also argues that Exide's 2013 bankruptcy case did not discharge its environmental claims because West Salem did not receive adequate notice of the bankruptcy case filing.

"Inadequate notice is a defect which precludes discharge of a claim in bankruptcy."[25] Due process requires notice that is "reasonably calculated to reach all interested parties, reasonably conveys all required information, and permits a reasonable time for a response."[26] Whether specific notice satisfies these requirements depends on whether the creditor is known or

---

[23] Paragraph 30 of the Complaint mentions the EES, although it is not attached as an exhibit. A copy of the EES is attached to the Transmittal Declaration of Stephan J. Della Penna Regarding Memorandum of Law in Support of the Defendant's Motion to Dismiss Complaint (Adv. D.I. 6).
[24] EES, at 5.1.
[25] *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995).
[26] *Id.*

12

unknown.[27] A known creditor is "one whose identity is either known or 'reasonably ascertainable by the debtor.'"[28] The debtor must provide a known creditor with actual written notice of the bar date.[29]

An unknown creditor, on the other hand, is "one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to [the debtor's] knowledge.'"[30] For unknown creditors, "constructive notice of the claims bar date by publication satisfies the requirements of due process."[31]

The Debtor did not provide West Salem with actual notice of the 2013 bar date. Therefore, whether the Debtor's publication notice of the bar date was sufficient depends on whether West Salem was a known or unknown creditor.

A creditor is a known creditor if its identity is "reasonably ascertainable" by the debtor.[32] The Third Circuit explained the "reasonably ascertainable" standard as follows:

> A creditor's identity is "reasonably ascertainable" if that creditor can be identified through reasonably diligent efforts . . . . Reasonable diligence does not require impracticable and extended searches . . . in the name of due process . . . . A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it . . . . The requisite search instead focuses on the debtor's own book and records. Efforts beyond a careful examination of these documents are generally not required . . . .[33]

Exide sent notice of the bar date for filing a claim to the prior owner of the Property listed in Exide's books and records - - which was not West Salem. West Salem, however, relies on a

---

[27] *Id.*

[28] *In re Nortel Networks, Inc.*, 531 B.R. 53, 63 (Bankr. D. Del. 2015) (quoting *Chemetron Corp.*, 72 F.3d at 346).

[29] *In re Energy Future Holdings Corp.*, 522 Bankr. 520, 529 (Bankr. D. Del. 2015).

[30] *Chemetron*, 72 F.3d at 346; *Mullane v. Central Hanover Bank Trust, Co.*, 339 U.S. 306, 317 (1950).

[31] *See Chemetron*, 72 F.3d at 348 (holding that notice to an unknown creditor is sufficient when it was published in the *The New York Times* and *The Wall Street Journal*).

[32] *Id.* at 346.

[33] *Nortel Networks*, 531 B.R. at 63 (quoting *Chemetron*, 72 F.3d at 346-47 (internal quotation marks and citations omitted)).

13

footnote in the *Chemetron* case, in which the Third Circuit acknowledged that "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records."[34] This requires an analysis of the specific facts and circumstances of the case.[35] West Salem argues that its ownership of the Property was reasonably ascertainable at the time of Exide's 2013 bankruptcy filing through a simple title search. Or, West Salem argues, the Debtors could have sent notice directly to the Property, addressed to the "current occupant."

West Salem's first argument is unconvincing because conducting title searches of over two hundred properties[36] is the sort of impractical and extended search that the *Chemetron* Court, and later decisions following *Chemetron*, decided was unnecessary.[37] The general rule in the Third Circuit is that a debtor is not required to look beyond its own books and records.[38] Moreover, "reasonable diligence" does not require the Debtors to provide "back-up notices" to entities other than those listed in the Debtors' books and records. Here, the Debtors relied on the information in their books and records to determine the owners of the properties with potential environmental liabilities and provided notice to those owners. The notice was reasonable under the circumstances.

"It is well settled that constructive notice of the claims bar date by publication, while less direct than actual notice, generally satisfies the requirements of due process for unknown

---

[34] *Chemetron*, 72 F.3d at 347 n.2.
[35] *Id.*
[36] The Debtors listed 237 properties subject to potential environmental liabilities on its Schedules of Assets and Liabilities and Statement of Financial Affairs. Adv. D.I. 23
[37] *See Chemetron*, 72 F.3d at 347-48 (deciding it was not practical for the debtor to conduct title searches on all properties surrounding the debtor's sites to determine all persons who might have lived in the area during the 20 years between the debtor's operations at the sites and the chapter 11 filing); *In re W.R. Grace & Co.*, 316 Fed.Appx. 134, 137 (3d. Cir. 2009) (deciding that the debtor was not required to conduct title searches for thousands of buildings where the debtor installed its products to determine the current owners of the buildings); *Pacificcorp and Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764, 2006 WL 2375371, at *10 (D. Del. Aug 16, 2006) (finding the debtor was not required to perform a title search to determine "numerous current and prior owners at numerous sites.").
[38] *Chemetron*, 72 F.3d at 347.

creditors."[39] The Debtors published Notice of Entry of the Bar Date Order Establishing Deadlines for Filing Proofs of Claim Against the Debtors (the "Bar Date Notice"[40]) in The Wall Street Journal, National Edition, and The New York Times, National Edition, along with "130 or so local and regional newspapers throughout the U.S. and Canada, including newspapers in the Portland, Oregon region where the property is located."[41]

West Salem was an unknown creditor and, therefore, under the facts and circumstances of this case, the Debtors' publication notice of the claims bar date was sufficient.

## CONCLUSION

Whether I analyze West Salem's claims under the Third Circuit's *Grossman's* test or the fair contemplation test, West Salem's claims against Exide based on the costs to remediate environmental damage on the Property arose prior to Exide's 2013 bankruptcy case. Moreover, at the time the Debtors provided notice of the bar date for filing claims in the 2013 bankruptcy case, West Salem was an unknown creditor and, therefore, notice of the bar date by publication satisfies due process.

Exide's Motion to Dismiss will be granted. An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: March 28, 2018

---

[39] *Nortel Networks*, 531 B.R. at 64 (citing *Chemetron*, 72 B.R. at 348).
[40] *See* D.I. 696, Ex. 2.
[41] Tr. (2/20/2018) at 9:12-15 (oral argument) (D.I. 4966); *See also Affidavit of Publication,* at ¶8 (D.I. 1040) (stating that the Bar Date Notice was published in the October 4, 2013 edition of the *Portland Oregonian* (among other papers)).